UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_ _ _ _ _ _ _ _ _ _ _ _

JOHN DOE,

                                                            File No. 1:21-cv-870

                    Plaintiff,

v.                                                          Hon.

MICHIGAN STATE UNIVERSITY,

                    Defendant.

_____/

### COMPLAINT AND JURY DEMAND

Plaintiff, John Doe[1], by and through his attorney, Tessa K. Muir of Springstead Bartish Borgula & Lynch, PLLC, hereby alleges as follows:

### INTRODUCTION

1. Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") is a federal law that prevents discrimination on the basis of sex in any education program that receives federal funding, including all public schools and universities ("schools").

2. Defendant, Michigan State University (MSU), is a public university.

3. Title IX dictates the parameters for school investigations into sexual misconduct, including allegations involving sexual assault.

4. Title IX requires certain due process rights for students accused of sexual assault, and it prohibits interim sanctions by a school before a decision-maker makes a final

---

[1] Plaintiff filed a separate motion to proceed anonymously in this action.

decision through the grievance process regarding the responsibility of the accused student(s). MSU has not followed the process required by Title IX and has thereby violated Plaintiff's rights.

5. Plaintiff is a male sophomore student attending MSU on a full scholarship for football.

6. In January 2021, Jane Doe, a female student at MSU, alleged that Plaintiff sexual assaulted her.

7. MSU notified Plaintiff and began an investigation, as required under Title IX. Since January 2021, MSU has not completed the grievance process, has not submitted the case to the final decision-makers, has not held a hearing, and has not provided Plaintiff with either updates regarding timing or an end date.

8. Since February 2021, during the pendency of the investigation, MSU has suspended Plaintiff from the football team. Plaintiff has not been able to practice, lift, compete, or travel with his team since then.

9. Plaintiff's interim suspension from the football team continues as of the filing of this complaint.

10. Defendant's suspension of Plaintiff from the football team, before a final determination regarding responsibility under Title IX, violates Title IX law.

11. Defendant has been unresponsive to Plaintiff's demands to reinstate Plaintiff to the team during the pendency of the grievance process, and, specifically, during the fall 2021 football season that is currently underway.

12. Depriving Plaintiff of access to the football team's activities deprives Plaintiff of a substantial educational opportunity.

13. MSU's response to the allegations — including the unlawful interim suspension from the football team — violates Plaintiff's rights under Title IX, breaches MSU's contractual duties to Plaintiff, and discriminates against Plaintiff because of his gender without a full and fair investigation into the allegations.

14. Plaintiff now seeks relief through the Court to avoid irreparable harm to Plaintiff and to remedy existing and ongoing violations by MSU of Title IX and the university's Title IX policies.

## PARTIES

15. Plaintiff is a sophomore and full-time student at MSU.

16. At all times relevant to this complaint, Plaintiff has lived in East Lansing, Michigan.

17. Defendant, MSU, is a public university located in East Lansing, Michigan.

18. MSU receives federal funding.

## JURISDICTION AND VENUE

19. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: Plaintiff states claims arising under the laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

20. This Court has personal jurisdiction over Defendant on the grounds that Defendant is conducting business within the Western District of Michigan.

21. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Defendant is considered to reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

### Background of Plaintiff and Jane Doe

22. Plaintiff grew up outside of Michigan and decided to attend MSU because he was heavily recruited as a football player, by MSU as well as other universities. He decided to attend MSU because of the opportunity to participate in a major football program and receive a full scholarship.

23. Plaintiff attended MSU starting in the summer of 2020, at which time he joined MSU's varsity football team.

24. Plaintiff reports no disciplinary history from college, high school, or earlier.

25. Jane Doe is also a student at MSU. She has a student internship position that requires her to interact with the football team on a daily basis, but the position prohibits her from fraternizing with the football players. An allegation that she had a consensual sexual encounter with a football player could cause her to lose her position.

26. Jane Doe has maintained her position with the football team during Plaintiff's suspension from the team.

27. Plaintiff continues to see Jane Doe almost daily, as he encounters her at the MSU football gym while he works out by himself. Upon information and belief, there have been no reported issues as a result of Plaintiff and Jane Doe's almost-daily encounters.

## Background of MSU Football

28. MSU's football team is a Division I team in the East Division of the Big Ten Conference.

29. MSU's football team has had one or more players selected in the National Football League (NFL) draft every year for 80 years in a row, from 1940-2020.[2]

30. Football is a large revenue generator for the university. MSU football plays in a home stadium with almost a 75,000-person capacity.[3] Since 2012, more than $50 million has been committed to upgrading the 97-year-old facility.[4] Games are well-attended by students, season ticket holders, and single ticket holders.

31. MSU's regular football season runs from September to November, with games on most Saturdays. In the fall 2021, it has 12 regular season games scheduled.

32. Since February 2021, Plaintiff has been prohibited from dressing for, playing in, or traveling to any games. The team has had five games so far in the 2021 season — September 3, September 11, September 18, September 25, and October 2. Plaintiff was not permitted to travel with the team to the two away games at Northwestern University (September 3, 2021), and University of Miami (September 18, 2021).

33. Members of the press have noticed Plaintiff's absence and inquired during MSU football press conferences about it. To date, MSU has not provided specific answers regarding his absence. Press inquiries will likely continue to be forthcoming.

---

[2] Chris Solari, Detroit Free Press, May 1, 20201, *Michigan State Football's NFL Draft Streak Ends After 80 Years: Tracking UDFAs*, https://www.freep.com/story/sports/college/michigan-state/spartans/2021/05/01/michigan-state-football-nfl-draft-streak-ends-after-80-years/4908218001/ (accessed Oct. 7, 2021).
[3] Spartan Stadium, https://msuspartans.com/sports/2018/7/20/facilities-spartan-stadium-html.aspx (accessed Oct. 8, 2021).
[4] *Id.*

### Alleged Sexual Assault, Team Suspension, and Investigation

34. Jane Doe alleges that on January 31, 2021, Plaintiff and another MSU football player sexually assaulted her in the other player's room (not Plaintiff's).

35. Plaintiff maintains that the encounter was consensual and that his participation involved receiving oral sex.

36. Plaintiff became aware of Jane Doe's allegation that the encounter was non-consensual shortly after the event.

37. Plaintiff reported the allegation to his football coach on or about February 3, 2021, after being questioned by police.

38. The head football coach, Mel Tucker, suspended Plaintiff from practice and all team activities starting the morning after Plaintiff reported it to the football team staff.

39. Since the imposition of the suspension from the football team's activities in February 2021, Plaintiff has missed all practices, camps, workouts, and games.

40. The football team lives on campus year-round, and Plaintiff remained on campus throughout the spring and summer, working out on his own.

41. Plaintiff lived with other football players in a dormitory on MSU's campus. In the summer of 2021, the other football players in the dormitory moved to student apartments with the rest of the football team. Plaintiff planned to move with them, and he had selected his roommates from the football team. Without explanation, the Plaintiff was not moved with the rest of the team, as he expected, and remained in the dormitory until July 2021.

42. Approximately two months after the rest of the football team moved into shared apartments, after Plaintiff's parents held a meeting with the MSU Athletic Director,

Plaintiff was moved to the student apartments with the rest of the team. He was placed in an apartment with other players, who were not the players he selected as roommates.

43. The suspension from the team's activities remained following transfer to the football team apartment.

44. The other football player accused by Jane Doe remained in the dormitory after Plaintiff, and was not moved to join the football team in the student apartments. Upon information and belief, he remains in the dormitory as of the filing of this complaint.

45. On March 30, 2021, Jane Doe ("the claimant") requested that MSU initiate a formal investigation into allegations of sexual assault by Plaintiff and the second MSU football player.

46. MSU provided notice to Plaintiff that it was initiating a formal investigation based on alleged violations of MSU's Relationship Violence and Sexual Misconduct and Title IX Policy ("Title IX Policy").

47. MSU assigned an investigator and began an investigation.. In summary, the report included the following:

   a. Jane Doe asserted that Plaintiff and another student on the football team sexually assaulted her.

   b. Plaintiff asserted that the encounter was consensual, that Jane Doe gave him oral sex, that he did not penetrate her vagina, and that the encounter was video recorded by the other student without the knowledge of either Plaintiff or Jane Doe and that it corroborates Plaintiff's version of events.

    c.   Witnesses indicated that Jane Doe was very concerned with losing her

        position working with the football team.

48. Plaintiff responded in writing to the investigator that Jane Doe's fear of losing her

    position could be the reason she reported the encounter as a sexual assault.

49. MSU did not hold a hearing and has not made a final decision in the grievance

    process as of the filing of this complaint.

50. Plaintiff never received written notice of a suspension from the football team, nor had

    the opportunity to respond. MSU insisted to Plaintiff that he was not "suspended"

    from the football team; however, he has been barred from all participation.

51. Plaintiff's attorney advisors attempted to resolve the issue with MSU's Title IX

    office, but the Title IX office responded that the restrictions on Plaintiff's football

    participation were the result of an "athletic department policy." MSU did not provide

    the athletic department policy to which it was referring. Plaintiff's attorney advisors

    responded that an athletic department policy cannot supersede Title IX, which is a

    federal law and which prevents interim punishment prior to a hearing by neutral

    decision-makers. MSU did not provide a response that justifies the prioritization of an

    athletic department policy over the requirements of Title IX.

52. On October 1, 2021, Plaintiff's attorneys sent a letter via email to MSU's President

    Samuel L. Stanley Jr., M.D., requesting that Plaintiff be reinstated to the football

    team immediately to prevent irreparable harm. The letter alleged that MSU violated

    Title IX and its own Title IX Policy by restricting Plaintiff from the football team as

    an interim measure, prior to the conclusion of the grievance process. Plaintiff's

    attorneys requested that Plaintiff be reinstated to the team by October 6, 2021. The

letter explained that if Plaintiff was not reinstated by October 6, 2021, Plaintiff

intended to proceed with a federal lawsuit and seek a temporary restraining order.

53. The attorneys' letter cited the relevant Title IX regulations that prohibit interim

punishment prior to a final hearing, specifically quoting the following:

> Question 21 of the document entitled *Part 2: Questions and Answers Regarding the Department's Title IX Regulations* issued by the Department of Education earlier this year on January 15, 2021, directly addresses this topic. It states the following:
>
> Question 21: Are recipients allowed to place holds (for example, on a transcript, registration, or graduation) on a respondent's account while a formal complaint process is pending, or is such action considered an impermissible sanction prior to a final determination regarding responsibility?
>
> Answer 21: The Title IX regulations prohibit a recipient from imposing "any disciplinary sanctions or other actions that are not supportive measures as defined in 34 C.F.R. § 106.30, against a respondent" without following the 34 C.F.R. § 106.45 grievance process. 34 C.F.R. §§106.44(a), 106.45(b)(1)(i). Even a temporary "hold" on a transcript, registration, or graduation will generally be considered to be disciplinary, punitive, and/or unreasonably burdensome, and appropriate supportive measures cannot be disciplinary, punitive, or unreasonably burdensome. In the Preamble to the regulations at, e.g., 30182, the Department stated: "**Removal from sports teams** (and similar exclusions from school-related activities) also require a fact-specific analysis, but whether the burden is 'unreasonable' does not depend on whether the respondent still has access to academic programs; whether a supportive measure meets the § 106.30(a) definition also includes analyzing whether a respondent's access to the array of educational opportunities and benefits offered by the recipient is unreasonably burdened. Changing a class schedule, for example, may more often be deemed an acceptable, reasonable burden than restricting a respondent from participating on a sports team, holding a student government position, participating in an extracurricular activity, and so forth."

54. Plaintiff's attorney advisors copied the Title IX Coordinator, the Associate Athletic

Director (football), and the MSU Board of Trustees on the October 1, 2021, letter.

55. MSU did not respond to Plaintiff's letter and did not reinstate Plaintiff to the team.

56. However, that same day, the President of MSU published a public letter on the university's website that a temporary Title IX Coordinator would be taking over from the outgoing Coordinator, who had been Plaintiff's point of contact throughout his Title IX investigation. The President did not provide a reason for the departure.[5]

57. As a result of MSU's unlawful suspension and failure to follow Title IX and MSU's Title IX Policy, Plaintiff has suffered adverse outcomes, including, but not limited to, anxiety and uncertainty over his future, loss of reputation, loss of trust by his teammates, loss of his position and status on the team, loss of the opportunity to sustain and build his football skills, loss of future employment prospects stemming from a Division I athletic career, loss of esteem, anger, disappointment, and embarrassment.

58. Upon information and belief, the other student-athlete whom Jane Doe claimed was involved in the same alleged sexual assault has also not received a hearing, nor notice of emergency suspension from the team, nor an opportunity to respond.

**General Requirements of Title IX**

59. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, is a federal civil rights law that prohibits discrimination on the basis of sex in education programs and activities. It applies to both public and private schools, from the elementary level through universities. It states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Its interpretation has

---

[5] MSU, 2021 Community Letters, https://president.msu.edu/communications/messages-statements/2021_community_letters/2021-10-01-ocr-title-ix-contact.html (accessed October 5, 2021).

been expanded to cover sexual assault, sexual harassment, and other types of sex and gender-related discrimination and misconduct at schools of all levels.

60. In 1975, the United States Department of Education's predecessor — the Department of Health, Education and Welfare — issued regulations interpreting and promulgating Title IX.

61. In 2020, the Department of Education formally amended the Title IX regulations for the first time in over 40 years and issued final Title IX regulations on May 6, 2020. The new Title IX regulation is codified in the Code of Federal Regulations at 34 C.F.R. Part 106, and it is enforced by the Department of Education's Office for Civil Rights ("OCR").

62. The regulations specify how recipients of federal financial assistance covered by Title IX, including elementary through post-secondary institutions, must respond to allegations of sexual harassment consistent with Title IX's prohibition against sex discrimination. The regulations retain the previous definition of "sexual harassment" to also include "sexual assault." 34 C.F.R. § 106.30.

63. Under the regulations, schools can offer supportive measures to either the complainant or respondent during the pendency of the investigation, but "supportive measures cannot be punitive or disciplinary against any party," and "disciplinary sanctions cannot be imposed against a respondent unless the recipient [of the complaint, i.e. the school] follows a grievance process that complies with § 106.45" of 34 C.F.R.[6]

---

[6] OCR, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, https://www.federalregister.gov/documents/2020/05/19/2020-10512/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal#footnote-30-p30031, at footnote 172 (accessed Oct. 5, 2021).

64. Under 34 C.F.R. § 106.44, the school's response "must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent."

65. The regulations permit an exception, allowing the removal of a student from an education program or activity "on an emergency basis, provided that the recipient [i.e. school] undertakes an individualized safety and risk analysis, determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal." 34 C.F.R. § 106.44(c).[7]

66. Before, during, and after a Title IX investigation, the school can offer "supportive measures," but not punishment or sanctions until after a final decision. "Supportive measures" include, for example, counseling, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work locations, and similar measures provided to the complainant and/or respondent. 34 C.F.R. § 106.30(a).

67. Athletic programs constitute education programs under Title IX. According to OCR, "[a]thletics are considered an integral part of an institution's education program and are

---

[7] MSU did not claim that its suspension of Plaintiff from the football team was an "emergency removal," nor did it provide a safety and risk analysis, nor provide Plaintiff with an opportunity to challenge the decision immediately following the removal.

therefore covered by this law [Title IX]."[8] According to the National Collegiate Athletic Association (NCAA), "the law applies to every single aspect of education, including course offerings, counseling and counseling materials, financial assistance, student health and insurance benefits and/or other services, housing, marital and parental status of students, physical education and athletics, education programs and activities, and employment."[9] As described in Plaintiff's October 1, 2021, letter to the President of MSU, OCR defines athletic programs as educational opportunities under Title IX.

68. The regulations mandate the grievance process for after a school receives a complaint of sex discrimination or sexual harassment (including sexual assault) under Title IX. The school must, for example:

    d.  "Treat complainants and respondents equitably," including "by following a grievance process that complies with [34 C.F.R. § 106.45] before the imposition of any disciplinary sanctions or other actions that are not supportive measures . . . against the respondent" (34 C.F.R. § 106.45(b)(1)(ii));

    e.  "Require an objective evaluation of all relevant evidence — including both inculpatory and exculpatory evidence — and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness" (34 C.F.R. § 106.45(b)(1)(ii));

    f.  Ensure its investigators and decision-makers are free from bias, prejudice, and conflicts of interest (34 C.F.R. § 106.45(b)(1)(iii));

---

[8] OCR, *Requirements Under Title IX of the Education Amendments of 1972*, https://www2.ed.gov/about/offices/list/ocr/docs/interath.html (accessed Oct. 5, 2021).
[9] NCAA, *Title IX Frequently Asked Questions*, https://www.ncaa.org/about/resources/inclusion/title-ix-frequently-asked-questions (accessed Oct. 5, 2021).

g.  Abide by a "presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process" (34 C.F.R .§ 106.45(b)(1)(iv));

h.  "Include reasonably prompt time frames for conclusion of the grievance process," absent written notice to the complainant and respondent for any delay or extension (34 C.F.R. § 106.45(b)(1)(v)); and

i.  Provide a live hearing (at the post-secondary level) (34 C.F.R. § 106.45(b)(6)(i)).

### Contractual Obligation of MSU

69. MSU's Title IX Policy provides greater specification for how it handles complaints and investigations under Title IX. MSU's Title IX Policy is posted publicly on the university's website and applies to all current students, faculty, staff, volunteers, and other members of the MSU community.

70. The Title IX Policy outlines supportive measures that MSU may offer to "restore or preserve equal access to MSU's education programs or activities," and "[s]upportive measures will not unreasonably burden the other party." (Title IX Policy, Sec. X.A.)

71. The Title IX Policy allows the university, consistent with the Title IX regulations, to impose emergency removal, as follows:

> **Emergency Removal of Students**:  The University may remove any student from its program or activity on an emergency basis if there is an immediate threat to the physical safety of any students or other individuals arising from allegations under this Policy. Prior to removal, the University must undertake an individualized safety and risk analysis, and, where such analysis determines a credible safety risk exists, provide the party with notice and an opportunity to challenge the decision immediately following the removal.

72. Plaintiff has not received notice, nor an individualized safety and risk analysis, nor an opportunity to challenge the decision immediately following his removal from the football

team or at any time since. MSU did not frame its interim suspension of Plaintiff from the football team as an "emergency removal."

73. The Title IX Policy provides the following timeframe for investigation (Sec. XIII.A.1):

> **Timeframe for Completion of Formal Grievance Process; Extension for Good Cause**: An investigation after the filing of a formal complaint will, in most cases, be completed within ninety (90) days, and a written decision following a hearing, if applicable, will be issued within sixty (60) days following the investigation. These time periods may be temporarily extended for good cause at the discretion of the University's Title IX Coordinator or designee, if deemed necessary to conduct a thorough investigation, to protect the rights of all parties, or for other reasonable considerations . . . . Parties will be sent written notice of any delay or extension, including the reason for the delay or extension.

74. The Title IX Policy provides the following requirement for status updates to the parties (Sec. XIII.B.4):

> **Status Updates:**  The parties will receive regular, bi-weekly updates regarding the status of the investigation.

75. MSU's investigation into Jane Doe's allegations has exceeded 90 days. The alleged incident occurred on January 31, 2021. MSU has not provided Plaintiff with written notice of delay, nor any reasons for the delay or extension.

76. The Title IX Policy provides the following presumption of non-responsibility (Sec. XIII.A.3):

> **Presumption of Non-Responsibility and Standard of Evidence:**  A respondent is presumed to be not responsible for the reported conduct until a determination regarding responsibility is made at the conclusion of the applicable formal grievance process.

77. The MSU football team's suspension of Plaintiff from all football activities presumes Plaintiff's responsibility on the basis of the allegations alone.

78. The Title IX Policy provides additional requirements for allowing the parties to respond to and provide requests regarding the final investigation, and participate in a live hearing. However, since the grievance process stalled before those steps, Plaintiff reserves complaint as to subsequent and future violations of the Title IX Policy's requirements.

## Background of MSU and Sexual Assault/Title IX

79. In February 2018, OCR opened a direct investigation into MSU and its Title IX compliance regarding the employment and conduct of former physician and employee Larry Nassar.[10] Larry Nassar was the center of a national sexual assault scandal involving female members of the USA Gymnastics team and college athletics at MSU, under the guise of medical treatment. Nassar was convicted of federal child pornography charges and numerous state charges of criminal sexual conduct involving female athletes. During its investigation, OCR obtained evidence showing potential Title IX issues related to William Strampel, the former dean of MSU's College of Osteopathic Medicine, and OCR expanded its directed investigation to include Strampel. The Michigan Attorney General ultimately charged Strampel with two counts of willful neglect of duty by a public officer, one count of criminal sexual conduct, and one count of misconduct by a public official in office. The willful neglect charges related to Strampel's oversight of Nassar, and the other two charges related to Strampel's own personal conduct.

80. On September 5, 2019, MSU and OCR entered into a Resolution Agreement that outlined numerous actions and requirements that MSU must take. The Resolution Agreement included requirements related to MSU employees who failed to take action regarding

---

[10] Report of Employee Review, MSU, 2019 Resolution Agreement, Section III, OCR Docket No. 15-18-6901, Sep. 1, 2020, https://msu.edu/ourcommitment/_assets/documents/strampel-ocr-report-sept-2020, p.1 (accessed Oct. 7, 2021).

Nassar and Strampel, and "many more actions that MSU must take to improve and strengthen the university's Title IX related policies and procedures."[11]

81. The same day that MSU entered into the Resolution Agreement with OCR, MSU accepted the immediate resignation of its provost, June Youatt. According to MSU President Samuel L. Stanley Jr., M.D., "The letter of findings from the Department of Education's Office for Civil Rights made it clear that the provost and former president failed to take appropriate action on behalf of the university to address reports related to former dean Strampel."[12] President Stanley wrote, "Acting President Satish Udpa has apologized on behalf of the university to all survivors and supporters impacted by these terrible situations, and I absolutely echo his sentiments. I am committed to using these findings and recommendations to significantly improve MSU's prevention of and response to sexual assault."[13] The letter concluded, "We know what needs to be done and we will do it. As we make progress, if we need to do more, we will."[14]

82. In November 2019, MSU published the results of its "Know More @ MSU" study that it launched in March 2019.[15] The survey collected responses from more than 15,000 MSU students, faculty, and staff.[16] The study concluded that, in the 2018-2019 academic year, nearly two-thirds of undergraduate women experienced sexual harassment and 13% of undergraduate women experienced sexual assault.[17] The assistant professor of social

---

[11] *Id.*
[12] Samuel L. Stanley Jr., M.D., MSU Community Letters, *Sep. 5, 2019: Message on U.S. Department of Education Investigations*, https://president.msu.edu/communications/messages-statements/2019_community_letters/2019_09_05_message_to_community.html (accessed Oct. 7, 2021).
[13] *Id.*
[14] *Id.*
[15] MSU Today, Nov. 21, 2019, *MSU releases campus survey results*, https://msutoday.msu.edu/news/2019/msu-releases-campus-survey-results (accessed Oct. 7, 2021).
[16] *Id.*
[17] *Id.*

work who led the survey effort concluded that "MSU has a significant number of community members who are experiencing relationship violence and sexual misconduct, and these experiences are upsetting and interfere with their school, work, and relationships."[18]

83. In September 2020, President Stanley reiterated that "[w]hile the [COVID-19] pandemic has resulted in our community being largely physically distanced for several months and into the fall semester, our work toward meaningful cultural change continues."[19]

84. It was in this climate — under intense scrutiny from the MSU community, OCR, and the public regarding MSU's mishandling of the Nassar and Strampel crimes — that Plaintiff's case was reported and the investigation began. On the heels of one of the largest sexual conduct scandals involving sports in the nation's history, at which MSU found itself at the center, MSU began its investigation into Plaintiff. The process fell short in some ways and overreached in others. The grievance process stalled over the course of seven months (to date), MSU imposed sanctions against Plaintiff prior to any finding of responsibility, and the Title IX Coordinator handling the case was suddenly replaced without explanation. The result is that Plaintiff has not received due process and has been deprived of an important educational opportunity, which will result in permanent harm to Plaintiff. Efforts to correct the problem directly with MSU have been unsuccessful.

---

[18] *Id.*
[19] Samuel L. Stanley Jr., M.D., MSU Community Letters, *Sept. 1: One-year progress on Title IX federal review*, https://president.msu.edu/communications/messages-statements/2020_community_letters/2020-09-01-one-year-progress-rvsm.html (accessed Oct. 8, 2021).

**COUNT 1:**
**Violation of Title IX of the Education Amendments of 1972,**
**20 U.S.C. § 1681 *et seq*. — Erroneous Outcome**

85. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86. Plaintiff was wrongly presumed responsible for sexual assault against Jane Doe, without a complete and thorough investigation and grievance process in accordance with MSU's Title IX Policy and federal Title IX law and regulations.

87. MSU rushed to suspend Plaintiff from the football team, depriving Plaintiff of an important educational opportunity as a full-scholarship football student-athlete. In violation of 34 C.F.R. § 106.44, MSU suspended Plaintiff from the football team immediately following the allegations, without "following a grievance process that complies with [34 C.F.R.] § 106.45."

88. MSU deprived Plaintiff of the "presumption that a respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process," in violation of 34 C.F.R. § 106.45(b)(1)(iv).

89. MSU failed to conclude the grievance process within a "prompt time frame," and did not provide Plaintiff with written notice for any delay or extension, in violation of 34 C.F.R. § 106.45(b)(1)(v).

90. MSU's actions resulted in the erroneous outcome that Plaintiff was suspended from the football team as an unlawful interim measure, prior to a final determination of responsibility through the Title IX procedures required by federal law and regulation.

91. MSU did not give Plaintiff proper notice of an interim suspension, nor an opportunity to respond or appeal. MSU has insisted that the policy is an "athletic department policy" but did not provide that policy to Plaintiff nor offer adequate explanation as to

how an athletic department policy can supersede the legal requirements of federal

Title IX law.

92. Gender bias motivated the interim suspension. Plaintiff denied Jane Doe's allegations

against him. Without any investigation, hearing, or final decision, MSU believed Jane

Doe from the outset over Plaintiff's denials. MSU assumed that the male student

accused of sexual assault was responsible and that the female complainant was telling

the truth.

93. MSU's separation of Plaintiff, but not Jane Doe, from participation with the football

team further evidenced gender discrimination. MSU barred the male player based on

mere allegations before an investigation, believing the female student's version of

events to be true and allowing Jane Doe to continue her participation with the team,

but not Plaintiff. If MSU's decision to bar Plaintiff from the team was not punitive

and was instead designed to prevent further contact between Plaintiff and Jane Doe,

MSU could have removed the female student from her position with the team if

permitted by law and policy, but chose to remove the male student instead.

94. Plaintiff held a prominent position in the university community as a result of his

gender. As a football player on an all-male Division I team, Plaintiff's position

caused MSU to react disproportionately in a rush to judgment by suspending Plaintiff

prematurely.

95. MSU approached the suspension in a climate in which it faced intense local and

national scrutiny and pressure for its failure to protect athletes from sexual assault

under male MSU employees, Nassar and Strampel.

96. Plaintiff's suspension from the football team is not a supportive measure.

97. The suspension is not an emergency measure, as it did not follow the required procedure for an emergency measure under Title IX.

98. The suspension is an erroneous outcome that deprived Plaintiff of a fair process.

99. Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and inherently unfair process in violation of Title IX.

100. This unlawful discrimination by Defendant, in violation of Title IX, proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish, severe emotional distress, injury to reputation, future economic loss, deprivations of due process, loss of educational opportunities, and loss of future employment prospects.

## COUNT 2:

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* — Selective Enforcement

101. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

102. Regardless of his level of responsibility or lack thereof for the sexual assault alleged by Jane Doe, MSU imposed sanctions on Plaintiff in the form of an interim suspension from the football team.

103. MSU's football team is a prominent part of the institution, garnering a large amount of public attention due to its status, history, and level of competition.

104. Plaintiff's status as a member of the football team caused him to be selectively targeted for harsh interim sanctions in the form of suspension from participation in an activity that is central to Plaintiff's educational opportunities and experience.

105. Had Plaintiff not been a male athlete accused of sexual assault, MSU would not have imposed such sanctions on him prior to a full investigation and final grievance process.

106.    Plaintiff's suspension from the football team is designed to punish Plaintiff while
       protecting MSU's reputation — particularly the reputation of the Division I football
       program and the athletic department.

107.    MSU imposed the interim measures as a result of Plaintiff's gender and his status
       as a male student-athlete on the football team.

108.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and
       inherently unfair process in violation of Title IX.

109.    This unlawful discrimination by Defendant, in violation of Title IX, proximately caused
       Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, mental
       anguish, severe emotional distress, injury to reputation, future economic loss, deprivations
       of due process, loss of educational opportunities, and loss of future employment prospects.

## COUNT 3:

### Breach of Contract

110.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

111.    Plaintiff was recruited to, applied to, and was accepted to MSU on a full
       scholarship.

112.    Plaintiff enrolled in MSU and moved to East Lansing, Michigan, to play for
       MSU's football team, eschewing other offers and opportunities to attend and play
       football at other universities.

113.    Plaintiff's application to and enrollment at MSU was done in reliance on MSU's
       representations, and with the reasonable expectation, that MSU would implement and
       enforce the provisions and policies set forth in its official publications, including its

Title IX Policy, including any updates to those policies produced, published, and/or disseminated by MSU.

114.   An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and MSU.

115.   Plaintiff entered into the contract with MSU with the belief and understanding that MSU would fulfill its obligations under its written policies.

116.   MSU breached its contract with Plaintiff, including by committing one or more of the following acts:

    a.  Failing to "restore or preserve equal access to MSU's education programs or activities" (Title IX Policy, Sec. X.A);

    b.  Failing either to complete the investigation in 90 days or, alternatively, provide written notice extending the time frame for good cause (*id.*, Sec. XIII.A.1);

    c.  Failing to presume Plaintiff not responsible, and instead assuming that Jane Doe's allegations were true and suspending Plaintiff from the football team without the proper investigative and decision-making process (*id.*, Sec. XIII.A.3); and

    d.  Failing to provide "regular, bi-weekly updates regarding the status of the investigation" (*id.*, Sec. XIII.B.4).

117.   Plaintiff, as an MSU student, is entitled to the conditions and promises in the Title IX Policy.

118.   As a result of MSU's breach of contract, Plaintiff has sustained significant damages, including severe mental distress and anguish, loss of educational

opportunities, loss of future employment opportunities, economic injuries, loss of

reputation, and other direct and consequential damages.

## COUNT 4:

## Negligence

119.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

120.   Defendant has a legal obligation to Plaintiff as a student at MSU.

121.   MSU has a duty to apply its own policies fairly to the members of its student

body.

122.   MSU breached that obligation by failing to apply its own Title IX Policy and

grievance procedure to Plaintiff.

123.   MSU's breach caused harm to Plaintiff.

## COUNT 5:

## Intentional Infliction of Emotional Distress

124.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

125.   MSU's conduct was intentional or reckless.

126.   MSU imposed restrictions on Plaintiff that deprived him of the educational

opportunities through the football team as a result of an allegation, without a final

investigation or decision through the university's grievance process.

127.   The interim suspension from the football team continued throughout the spring,

summer, and fall of 2021.

128.   This deprivation caused Plaintiff to miss three seasons of football training and team

development, as well as half or more of the fall competition season, without a final

decision through the Title IX grievance process.

129.    MSU's Title IX office refused to correct the problem, citing "athletic department policy."

130.    MSU's President, or any member of MSU's administration or Board of Trustees, did not respond to Plaintiff's letter on October 1, 2021, requesting immediate reinstatement to the team.

131.    MSU's conduct was extreme or outrageous.

132.    MSU's conduct resulted in severe and serious emotional distress.

133.    As a direct and proximate cause of MSU's conduct, Plaintiff has been injured.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully prays that this Court:

A.    Enter an order declaring that MSU has engaged in unlawful practices under Title IX and the regulations promulgated thereunder;

B.    Award Plaintiff compensatory damages for monetary and non-monetary loss in an amount he is found to be entitled for mental anguish, loss of trust, severe emotional distress, injury to reputation, future economic loss, loss of future career prospects, loss of educational opportunities, and other injuries proximately caused by the wrongful conduct of Defendant;

C.    Award Plaintiff reasonable attorney fees and expenses pursuant to 42 U.S.C. § 1988 or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

D.    Award prejudgment interest;

E.    Order MSU to remove the interim suspension and reinstate Plaintiff to the football team;

F.   Order MSU to dismiss or complete its Title IX investigation in compliance with

Title IX and MSU's Title IX Policy;

G.   Maintain jurisdiction over this action to monitor MSU's compliance with the

Court's orders; and

H.   Order such other and further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES TRIABLE BY A JURY.**

Respectfully submitted,

Dated: October 8, 2021

  _/s/ Tessa K. Muir____
TESSA K. MUIR
Counsel for Defendant

Springstead Bartish Borgula & Lynch
60 Monroe Center St. N.W., #500
Grand Rapids, Michigan 49503
(616) 458-5500
tessa@sbbllaw.com

## <u>CERTIFICATE OF SERVICE</u>

On October 8, 2021, my office mailed a copy of this complaint to MSU via certified mail to its Office of General Counsel, 426 Auditorium Road, Room 494, East Lansing, Michigan 48824.


Dated: October 8, 2021                                  _/s/ Tessa K. Muir____
                                                        TESSA K. MUIR
                                                        Counsel for Defendant

                                                        Springstead Bartish Borgula & Lynch
                                                        60 Monroe Center St. N.W., #500
                                                        Grand Rapids, Michigan 49503
                                                        (616) 458-5500
                                                        tessa@sbbllaw.com